IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,            :

        Plaintiff,            :

        vs.            :

BRANDON R. STEPHENS,            :

        and            :

DAVID L. JONES            :

        Defendants.            :

Case No. 3:07cr053(1) & (2)

JUDGE WALTER HERBERT RICE

---

DECISION AND ENTRY OVERRULING MOTION TO SUPPRESS
EVIDENCE FILED BY DEFENDANT DAVID L. JONES (DOC. #20);
DECISION AND ENTRY OVERRULING MOTION TO SUPPRESS
EVIDENCE FILED BY DEFENDANT BRANDON R. STEPHENS
(DOC. #21)

---

The Defendants, Brandon R. Stephens ("Stephens") and David L. Jones

("Jones"), are each charged in the Indictment (Doc. #12) with one count of

conspiring to possess with intent to distribute in excess of five kilograms of

cocaine and one count of possessing with intent to distribute in excess of five

kilograms of cocaine.  Those charges stem from the March 9, 2007, stop of a

2005 Pontiac Grand Prix, which Stephens was driving and in which Jones was

riding as a passenger, by Deputy William Stavermann ("Stavermann") of the

Warren County, Ohio, Sheriff's Department.  The cocaine which underlies this prosecution was seized as a result of the subsequent search of the Pontiac.[1]

This case is now before the Court on the Defendants' Motions to Suppress Evidence, with they seek the suppression of the cocaine seized from the vehicle in which they were traveling.  See Doc. #20 (Jones' Motion to Suppress Evidence); Doc. #21 (Stephens' Motion to Suppress Evidence).  This Court conducted an oral and evidentiary hearing on those motions over the course of three days.  The Parties have filed their post-hearing memoranda.  See Doc. ##37-39, 41 and 42.  The Court now rules upon the Defendants' motions seeking suppression of evidence, beginning by making its factual findings based upon the evidence presented during the hearing.

On March 9, 2007, Stavermann was working the 4:00 p.m. to midnight shift, assigned to routine road patrol.  At approximately 10:50 p.m., the deputy was in his cruiser, which was in a stationary position in the passenger pickup area of the Kings Island amusement park.  He observed a Pontiac Grand Prix being driven north on Kings Island Drive at what appeared to be an excessive rate of speed.  Upon activating the laser device in his cruiser, Stavermann was able to ascertain that the vehicle was being driven at 62 miles per hour, in an area where the speed limit was but 45 miles per hour.  After the Pontiac Grand Prix had passed him, Stavermann pulled out behind it and initiated a traffic stop, thus seizing Stephens and Jones.[2]

---

[1]A loaded, small caliber pistol and a crack pipe were also discovered and seized during that search.

[2]When Stavermann turned on the overhead lights on his cruiser, a video recording device was activated, which recorded the traffic stop of the Defendants.

Stephens promptly brought the Pontiac Grand Prix to a stop after Stavermann had activated the overhead lights on his cruiser.[3]  The deputy then notified the Warren County communications center of the stop and the number of the Ohio license plate on that vehicle,[4] after which he approached its driver's side. When Stavermann approached the vehicle, he observed that it had two occupants, neither of whom made an unusual or furtive movement.  He also noticed numerous air fresheners in the rear and others on the rear view mirror of the Pontiac Grand Prix.  Stephens appeared to be overly polite to the deputy.[5]  Stavermann asked him if he knew why he had been stopped.  Stephens, in turn, volunteered that he knew that he had been speeding.  In response to Stavermann's request, Stephens provided his driver's licence and proof of insurance.  Stavermann also asked Jones for identification.  Although that Defendant did not have any identification, he gave the deputy his name, date of birth and Social Security number.

---

[3]The area where Stavermann pulled over the vehicle in which Stephens and Jones had been traveling is not considered a high crime area.

[4]In response to the license plate number furnished by Stavermann, the communications center indicated that the automobile was registered to Stephens and that there were no outstanding arrest warrants for him.  Since the deputy's attention was focused upon approaching that vehicle, he did not hear that communication.

[5]Stavermann explained that Stephens appeared to be overly polite, because he appeared to want merely to be given the traffic ticker and to be on his way. Notably, the deputy did not testify that the speeders he typically stops have any other desire than to be on their way as soon as possible.  For instance, Stavermann did not cite examples where speeders have asked to spend an additional hour or two with him after he has issued the traffic citation or that he take longer to issue the citation.  In addition, Stavermann indicated that Stephens appeared to be nervous, although he did not explain how that state had manifested itself, other than being overly polite.

Upon returning to his cruiser, Stavermann initially contacted Officer Mathew Hayes ("Hayes"), a K-9 officer employed by the Mason, Ohio, Police Department, to request that he and his German Shepard dog, Zicco, come to the location of the traffic stop. Stavermann contacted Hayes because he suspected that the Defendants were transporting narcotics in the Pontiac Grand Prix.[6] Stavermann based that suspicion on Stephens being overly polite and nervous and the number of air fresheners in the car. The deputy contacted Hayes about four minutes after he had stopped that vehicle, and the communication between the two lasted a matter of seconds. After briefly speaking with Hayes,[7] Stavermann inputted information from Stephens' driver's license into the computer located in the cruiser, in order to ascertain whether there were any outstanding arrest warrants for that Defendant.[8] Stavermann learned from the computer search that there were not any such. The deputy then repeated that process, entering Jones' Social Security number into the computer. After he had done so, the computer indicated that there was an outstanding felony arrest warrant for Jones, charging him with burglary in Franklin County, Ohio.[9] Stavermann learned about that warrant about

---

[6]Indeed, Stavermann indicated that he had such a suspicion from the moment he spoke with Stephens, while he (the deputy) was standing beside the Pontiac Grand Prix. Moreover, he testified that, from the moment he contacted Hayes, his focus became following up on his suspicions concerning drugs, rather than writing a speeding ticket.

[7]During his conversation with Hayes, Stavermann encouraged him to come to the location of the stop more quickly than the 10 minutes Hayes had estimated that it would take.

[8]It will be recalled that the deputy was unaware of the earlier communication notifying him of that fact. See Footnote 4, supra.

[9]This information, highlighted in red, came up on the computer screen in Stavermann's cruiser.

seven minutes after he had stopped the Pontiac Grand Prix.  Procedures required Stavermann to confirm the information concerning such a warrant.  Accordingly, he contacted the communications center, provided Jones' name and Social Security number and requested that the existence of the warrant be confirmed through Columbus.[10]  While he was engaging in those tasks, Stavermann also worked briefly on the speeding citation for Stephens.

The deputy then exited his cruiser, walked to the passenger side of the Pontiac Grand Prix and asked Jones to get out of the vehicle.  After Jones had exited, and Stavermann had informed him that he had asked him to exit from the vehicle because of the outstanding arrest warrant, Stavermann walked Jones to the rear of the Pontiac Grand Prix.  Shortly thereafter, at about ten or eleven minutes after the stop, Hayes arrived at the location of the traffic stop, accompanied by his drug detection dog, Zicco.  At that point, Stavermann frisked and put handcuffs on Jones and walked him to his cruiser, placing him in the rear seat.  Jones was so secured at between 12 and 13 minutes after the traffic stop.

After Jones had been secured in the rear of his cruiser, Stavermann did not return to the task of writing a speeding ticket for Stephens; rather, he briefly conferred with Hayes, while standing at the passenger's side of the Pontiac Grand Prix, and then watched Stephens, as Hayes prepared to and then walked Zicco around the vehicle, slightly more than 14 minutes after he (Stavermann) had stopped Stephens' vehicle.[11]

---

[10]At this point, Stavermann was the only law enforcement officer present.

[11]Before he walked Zicco around the Pontiac Grand Prix, Hayes explained to Stephens who he was and that his canine was capable of detecting the odor of illegal drugs.  Hayes also asked Stephens whether there was anything he (Hayes)

The dog Hayes walked around Stephens' vehicle, Zicco, was a properly trained and reliable drug detection dog.  As he typically does, Hayes started Zicco at the front bumper on the driver's side of the Pontiac Grand Prix.  Continuing to follow custom, Hayes walked Zicco around that vehicle in a counterclockwise direction.[12]  Near the front door on the driver's side, Zicco alerted by placing his nose near the door handle on the front door, thus indicating that controlled substances were located inside the vehicle.  Hayes did not continue walking Zicco around the exterior of the car, after the dog had alerted.[13]  When the canine alerted, Stavermann asked Stephens to exit the Pontiac Grand Prix.  He was watched by Deputies Tewmey and Purdy, both of whom were then employed by the Warren County Sheriff's Department and who had recently arrived at the location of the traffic stop.  With Stephens out of his vehicle, Hayes had Zicco examine the interior of that automobile.  The dog alerted on the automobile's center console.[14]

Stavermann then entered the driver's side of the Pontiac Grand Prix.  He was joined by Hayes, who entered through the passenger's side.  Stavermann began searching the vehicle's central console, wherein he discovered a small caliber

---

needed to know before walking the dog around the vehicle, in order to afford Stephens the opportunity of telling him about any weapons therein.  Stephens indicated that there were no such weapons.

[12]When the two would come to an area of the car which Hayes wanted Zicco to examine, he would "present" that area to the dog, by running his hand in an upward motion, three times, over that location.

[13]Hayes rewarded Zicco, by giving him a piece of rubber tubing.  Hayes explained that he does not reward his dog on every occasion it alerts, but he does so occasionally.

[14]Once again, Hayes rewarded his canine.

revolver, which was loaded.  Hayes discovered a glass crack pipe with residue, located in the glove compartment on the passenger's side.[15]  After the two law enforcement officers had completed searching the front and back seats of the Pontiac Grand Prix, Hayes folded the rear seat down, allowing them to see a large, blue duffel bag in the trunk.  After they had opened the trunk and removed the duffel bag therefrom, Stavermann discovered 12 cellophane wrapped packages inside the duffel bag.  Hayes stuck his knife into one of those packages.  The knife had white powder on its blade, when it was removed from the package.  The packages were later tested at the Miami Valley Crime Laboratory and found to contain cocaine.[16]

In his post-hearing memorandum (Doc. #37), Stephens initially argues that this Court must suppress the cocaine that was seized from the automobile in which they were traveling, because Stavermann lacked reasonable suspicion, justifying his detention from the time of the traffic stop, until Hayes and his canine Zicco had arrived at the scene of the traffic stop and the dog had alerted on the Pontiac Grand Prix.  Alternatively, Stephens argues therein that Zicco was not a sufficiently reliable drug detection dog to establish probable cause to believe that controlled substances would be found in the vehicle.  In his post-hearing memorandum (Doc. #38), Jones similarly argues that Stavermann did not have reasonable suspicion to detain him, before the deputy discovered that there was an

---

[15]They also discovered five cell phones inside the car.

[16]Stavermann gave Stephens a speeding ticket later that evening.  He subsequently entered a guilty plea to the speeding offense in Mason Municipal Court.

outstanding warrant for him. Moreover, like Stephens, Jones challenges the lawfulness of the search of the Pontiac Grand Prix, asserting that Zicco was not sufficiently reliable to establish probable cause.[17] In addition to disputing the Defendants' arguments, the Government has filed a memorandum, in which it argues that Jones is without standing to challenge the search of the Pontiac Grand Prix, because he did not have a reasonable expectation of privacy in that vehicle.[18] See Doc. #28. Jones has responded to that argument in his post-hearing memorandum. See Doc. #38. It is to the issue of Jones' reasonable expectation of privacy in the searched vehicle to which this Court initially turns. Thereafter, the Court will rule on the Defendants' arguments that Stavermann lacked reasonable suspicion to detain them until Zicco alerted on the Pontiac Grand Prix,[19] following which the Court will turn to the issue of probable cause, if necessary.

---

[17]Neither Defendant has argued that Stavermann violated the Fourth Amendment by stopping the Pontiac Grand Prix in which they were traveling. Such an argument would be fruitless, given that a traffic stop, supported by probable cause to believe that a traffic violation has occurred, is reasonable under the Fourth Amendment. Whren v. United States, 517 U.S. 806, 810 (1996). Herein, the deputy had such probable cause, given that he had confirmed by laser that Stephens was driving the Pontiac Grand Prix at 62 m.p.h., in an area where the speed limit was 45, before he (Stavermann) stopped that vehicle.

[18]Stephens was the driver and registered owner of the Pontiac Grand Prix. The Government has not argued that he was without a reasonable expectation of privacy in that vehicle.

[19]In actuality, Jones phrases the issue as being whether Stavermann had reasonable suspicion, justifying his (Jones') detention until Stavermann discovered the existence of the felony arrest warrant. The distinction is one without a difference on the result of this Decision, since, if the longer period of time did not invalidate a later search, the shorter such certainly would not have done so.

I.  Did Jones Have a Reasonable Expectation of Privacy in the Pontiac Grand Prix?

In Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court reiterated that Fourth Amendment rights are personal and may not be asserted vicariously.  Id. at 133-34.  Thus, the Rakas Court noted that the "capacity to claim the protection of the Fourth Amendment depends … upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place."  Id. at 143.  See also, United States v. Whitehead, 415 F.3d 583, 587 (6th Cir. 2005).  In Rakas, "the Supreme Court held that passengers in a vehicle driven by the owner of the vehicle did not have a legitimate expectation of privacy, because they asserted neither a property nor a possessory interest in the vehicle, nor an interest in the property seized."  United States v. Smith, 263 F.3d 571, 582 n. 4 (6th Cir. 2001).[20]

Herein, Jones has not presented evidence demonstrating that he had a legitimate expectation of privacy in the Pontiac Grand Prix, through an ownership or possessory interest, or in the cocaine that was seized therefrom.  Nevertheless, Jones contends that, if he has no possessory interest in the cocaine that was seized from the Pontiac Grand Prix, he should not have been charged with offenses arising out of the possession of that controlled substance.  See Doc. #38 at 3-4.  Without expressly so identifying it, Jones appears to be relying upon the automatic standing rule established by the Supreme Court in Jones v. United States, 362 U.S. 257 (1960), under which any person charged with a possessory offense could

---

[20]Parenthetically, the Government concedes that, in accordance with Brendlin v. California, — U.S. —, 127 S.Ct. 2400 (2007), Jones can rely upon his own personal rights under the Fourth Amendment to challenge the constitutionality of the stop of the vehicle and of his detention.  See Doc. #28 at 2 (unnumbered).

challenge the constitutionality of the search in which incriminating evidence was discovered, regardless of whether the search violated his rights under the Fourth Amendment.  The flaw in this argument is that the automatic standing rule of Jones was explicitly overruled by the Supreme Court in United States v. Salvucci, 448 U.S. 83 (1980).  Therefore, this Court rejects the notion that Jones has standing to challenge the constitutionality of the search of the Pontiac Grand Prix, merely because he has been charged with offenses relating to the possession of the cocaine seized therefrom.  Accordingly, this Court concludes that Jones may not challenge the lawfulness of the search of the Pontiac Grand Prix, i.e., whether Zicco was sufficiently reliable to establish probable cause.[21]

## II.  Did Stavermann's Detention of the Defendants Violate the Fourth Amendment?

Zicco alerted on the Pontiac Grand Prix slightly more than 14 minutes after Stavermann had stopped that vehicle.  Broadly speaking, the Defendants argue that this extended detention violated their rights under the Fourth Amendment, and the Government disagrees.  This Court begins its analysis by reviewing the legal standards which are applicable to resolving this dispute.

---

[21]Jones also argues that his personal right to be free from unreasonable searches and seizures did not end merely because he was a passenger in the Pontiac Grand Prix and that the passenger's expectation of privacy cannot be discarded since he is not the owner or operator of the vehicle.  See Doc. #38 at 3.  However, in Rakas, the Supreme Court held that a passenger, without more, does not have a reasonable expectation of privacy in a vehicle.  Moreover, the Rakas Court indicated that "[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."  439 U.S. at 131 n. 1.  Jones has not met his burden in that regard as it relates to the Pontiac Grand Prix.

An ordinary traffic stop is analogous to a seizure under <u>Terry v. Ohio</u>, 392 U.S. 1 (1968). <u>See</u> <u>Berkemer v. McCarty</u>, 468 U.S. 420, 438 (1984); <u>United States v. Palomino</u>, 100 F.3d 446, 449 (6th Cir. 1996). As indicated above, neither Defendant herein has argued that the initial stop of the Pontiac Grand Prix violated the Fourth Amendment; therefore, the Court focuses at this point on their detention after the initial stop. In <u>Illinois v. Caballes</u>, 543 U.S. 405 (2005), the Supreme Court held that the Fourth Amendment is not implicated, when a drug detection dog is walked around the exterior of a vehicle, sniffs the car and alerts on it, indicating that controlled substances were located therein, as long as the vehicle was lawfully stopped and the actions of the drug detection dog do not extend the stop. Therein, the Court also reiterated that "[a] seizure that is justified solely by the interest in issuing a [traffic] ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." <u>Id</u>. at 407. In <u>Palomino</u>, the Sixth Circuit elaborated upon that principle, indicating that, even if the initial stop were lawful, any subsequent detention must not be excessively intrusive. <u>Id</u>. Put differently, once the purpose of the traffic stop has been completed, a motorist cannot be further detained unless something that occurred during the stop generated a reasonable and articulable suspicion of illegal activity. <u>United States v. Mesa</u>, 62 F.3d 159, 162 (6th Cir. 1993). <u>See</u> <u>also</u>, <u>United States v. Townsend</u>, 305 F.3d 537 (6th Cir. 2003); <u>United States v. Hill</u>, 195 F.3d 258, 264 (6th Cir. 1999) ("Reasonable police conduct under such circumstances is such that any subsequent detention after the initial stop must not be excessively intrusive in that the officer's actions must be reasonably related in scope to circumstances justifying the initial interference. … Once the purpose of

the traffic stop is completed, a motorist cannot be further detained unless
something that occurred during the stop caused the officer to have a reasonable
and articulable suspicion that criminal activity was afoot.") (citations omitted), cert.
denied, 528 U.S. 1176 (2000).

        In deciding whether reasonable suspicion existed, this Court must not
consider the factors relied upon by the officers to justify the detention in isolation,
since to do so would be to ignore the totality of the circumstances.  United States
v. Arvizu, 534 U.S. 266 (2002).  In determining whether the totality of the
circumstances supports the conclusion that reasonable suspicion exists, the
reviewing court must bear in mind that officers are entitled to draw upon their own
experience and specialized training to make inferences.  Id. at 273.  The
Government has the burden of proving by the preponderance of the evidence the
existence of a reasonable suspicion to believe, based upon objective and articulable
facts, that the Defendants were engaged in criminal activity.  See e.g., United
States v. Rivas, 157 F.3d 364, 367 (5th Cir. 1998); United States v. Shareef, 100
F.3d 1491, 1500-01 (10th Cir. 1996); United States v. Winfrey, 915 F.2d 212,
216 (6th Cir. 1990), cert. denied, 498 U.S. 1039 (1991); United States v.
Longmire, 761 F.2d 411, 417-8 (7th Cir. 1985).

        Herein, the Court has found that Stavermann transformed the traffic stop
into a drug investigation, based upon seeing air fresheners in the rear window of
the Pontiac Grand Prix and others hanging from the rear view mirror of that vehicle,
and Stephens being overly polite as well as displaying nervousness.  It does not
appear that the Government is arguing that, as a result of those observations,
Stavermann had developed the type of reasonable suspicion that would support

transforming a routine traffic stop for speeding into a drug investigation.  On the contrary, the Government addresses that issue in one paragraph of its post-hearing memorandum, stating:

> Based upon his experience, training and observations that he made during his initial approach to the vehicle, Deputy Stavermann believed that he had reasonable suspicion to merit the assistance of a canine drug detection team. There is no evidence to suggest that Deputy Stavermann failed to diligently pursue his investigation.  Upon speaking to the occupants, he immediately returned to his cruiser, radioed Officer [Mathew] Hayes and requested canine assistance.  See United States v. Johnson, 267 Fed. Appx. 412 (6th Cir. 2008).

Doc. #41 at 8.[22]  However, if the Government is arguing that Stavermann's observations constitute the type of reasonable and articulable suspicion that would support transforming the traffic stop into a drug investigation, as opposed to the Government merely stating what the deputy believed, the Court would reject the Government's argument in that regard.  On the contrary, if necessary, this Court would find that Stephens was merely being helpful, by attempting to expedite matters so that Stavermann could write the traffic ticket, thus allowing him (Stephens) to proceed on his way as quickly as possible.  It bears emphasis that it was nearly 11:00 at night when Stephens interacted with Stavermann and that the former had to drive to Columbus that night.  It is difficult if not impossible to imagine a traveler who would want to extend a traffic stop.  Moreover, the fairest interpretation of Stavermann's testimony is that Stephens' alleged nervousness

---

[22]In United States v. Johnson, 267 Fed. Appx. 412 (6th Cir. 2008), the case cited by the Government, the Sixth Circuit concluded that, under the circumstances of that case, the officer who had stopped the vehicle in which the defendants were traveling had reasonable suspicion justifying prolonging a traffic stop in order for a drug detection dog to be called.  Those circumstances are not remotely analogous to the air fresheners, over-politeness and nervousness, upon which Stavermann relies herein.

was merely a manifestation of his alleged over-politeness.  In addition, courts have held that, although an air freshener standing alone will not support the finding that there is reasonable suspicion to believe that the occupants of an automobile are transporting controlled substances, when coupled with other indicia of criminal activity, it will support such a finding.  See e.g., United States v. Villa-Chaparro, 115 F.3d 797, 802 (10th Cir.), cert. denied, 522 U.S. 926 (1997).  Nevertheless, the Government argues that the detention of the Defendants between the time of the stop and when Zicco alerted on the Pontiac Grand Prix did not violate their rights under the Fourth Amendment.  For reasons which follow, this Court agrees.[23]

In particular, the Government asserts that the discovery by Stavermann of the outstanding felony warrant for Jones generated reasonable suspicion of illegal activity, justifying him to extend the stop and to shift his attention away from writing a traffic for Stephens.  In response, the Defendants argue that it was not constitutionally permissible for Stavermann to ask Jones for personal identification and his Social Security number or to have entered that information into his computer.  To support that proposition, Stephens has cited two decisions by state

_____

[23]It bears emphasis that, in determining whether the Government has established the existence of reasonable suspicion, justifying the detention of the Defendants for a period of time longer than necessary to complete the writing of the traffic citation for Stephens, this Court must not consider Stavermann's subjective motivation for that detention.  Whren v. United States, 517 U.S. 806 (1996).  In Whren, the Supreme Court rejected the argument that an officer's subjective motivation was pertinent to the inquiry as to whether a traffic stop violated the Fourth Amendment.  Rather, the Whren Court held that a traffic stop does not violate the Fourth Amendment, as long as there is probable cause to believe that there has been a violation of a traffic ordinance, regardless of the officer's subjective motivation for the stop.  Accord United States v. Ferguson, 8 F.3d 385 (6th Cir. 1993) (en banc).

courts which held that officers violated the Fourth Amendment by requesting

identification from passengers in stopped vehicles and then running that

information through a computer.  See State v. Larson, 93 Wash.2d 638, 661 P.2d

771 (1980); State v. Damm, 246 Kan. 220, 787 P.2d 1185 (1990).[24]  More

recently, the Illinois Supreme Court has reached the opposite conclusion.  People v.

Harris, 228 Ill.2d 222, 886 N.E.2d 947 (2008).  Although there is little federal

authority on the question, Harris is consistent with the small number of federal

decisions addressing the issue and with decisions by the United States Supreme

Court issued after the Washington and Kansas Supreme Court, respectively,

decided Larson and Damm.  Consequently, this Court concludes that the approach

taken by the Illinois Supreme Court constitutes the appropriate resolution of this

question under the Fourth Amendment.

      In United States v. Slater, 411 F.3d 1003 (8th Cir. 2005), the court rejected

the proposition that a passenger's Fourth Amendment rights were violated by an

officer seeking identification from him and, then, checking to determine the

presence of outstanding warrants.[25]  In Slater, the court relied extensively on

_____

[24]Stephens has also cited State v. Tompkins, 341 Ore. 368, 143 P.3d 530 (2006),
wherein the Oregon Supreme Court held that asking the passenger in a lawfully
stopped vehicle for identification violates the Oregon Constitution.  Since the
Tompkins court did not rely upon the Fourth Amendment, this Court does not
consider that decision as pertinent to the present dispute, which is predicated on
the Fourth Amendment to the federal Constitution, rather than upon the Oregon (or
an analogous state) Constitution.

[25]Slater had been the passenger in a car that was stopped at a sobriety checkpoint.
When the driver conceded that he had been drinking, he was ordered out of the
vehicle for a field sobriety test.  After performing that test, the officer asked Slater
for identification.  Upon running a check on that identification, the officer
discovered that there was an outstanding arrest warrant for Slater.  When he was
taken into custody, Slater was searched, and a firearm was seized.  Slater was

- 15 -

Muehler v. Mena, 544 U.S. 93 (2005).[26]  Similarly, the Illinois Supreme Court

relied upon Muehler in Harris.[27]  That decision by the United States Supreme Court

arose out of an action initiated by Iris Mena under 42 U.S.C. § 1983, alleging that

the defendants, police officers, had violated the Fourth Amendment by asking her

questions while she was in handcuffs during the execution of a search warrant.[28]

The Muehler Court held that the questioning of Mena did not constitute a separate

violation of the Fourth Amendment, as long as it had not extended the length of

her detention.[29]  In Slater and Harris, the courts applied the rule established in

_____

prosecuted for being a convicted felon in possession of that firearm.

[26]Federal courts have frequently applied Muehler in cases arising out of traffic stops, albeit in contexts different that those giving rise to the current dispute.  See e.g., United States v. Mendez, 476 F.3d 1077 (9th Cir. 2007).

[27]Harris had been a passenger in an automobile stopped for making an illegal left turn.  During the course of the traffic stop, Harris provided his identification to the officers, at their request.  A computer search revealed that there was an outstanding warrant for him.  He was arrested and searched.  During the search, officers discovered cocaine and drug paraphernalia, which served as the basis for charges brought against him.  Harris moved to suppress that evidence, arguing that the officers violated the Fourth Amendment by asking for his identification and then conducting a computer search with the information obtained as a result.

[28]The Muehler Court noted that detaining Mena in handcuffs was authorized by Michigan v. Summers, 452 U.S. 692 (1981).

[29]It took Stavermann a matter of seconds to ask Jones for identification and to obtain his Social Security number and date of birth.  In addition, he testified that the process of running Jones' Social Security number was very quick.  Given that these actions did not appreciably extend the duration of the detention, this Court cannot conclude that accomplishing those brief tasks removes this case from the rule announced in Muehler.  See United States v. Stewart, 473 F.3d 1265, 1269 (10th Cir. 2007) (noting that, since defendant had conceded that asking him about firearms in his vehicle did not appreciably extend his detention, there was no Fourth Amendment violation as a result of asking the question).  Cf. United States v. Burton, 334 F.3d 514, 518 (6th Cir. 2003) (noting that asking more questions to the occupants of a stopped vehicle than are necessary to issue a traffic citation

<u>Muehler</u> in order to conclude that asking the passenger of a stopped vehicle for personal identification did not violate the Fourth Amendment.  <u>See</u> <u>also</u>, <u>United States v. Delano</u>, 543 F. Supp.2d 791, 799 (N.D.Ohio 2008) (holding that obtaining and running Social Security number of a passenger in a stopped automobile is permissible under the Fourth Amendment); <u>United States v. Soriano-Jarquin</u>, 492 F.3d 495 (4th Cir. 2007) (holding that seeking identification from passengers of a vehicle, which has been lawfully stopped for a traffic offense, was not a separate Fourth Amendment event), <u>cert</u>. <u>denied</u>, 128 S.Ct. 1221 (2008). Accordingly, this Court concludes that Stavermann did not violate the Fourth Amendment by asking Jones for personal identification.

Having so concluded, the Court turns to a review of the events which occurred during the stop, in order to assess whether Stavermann unduly extended it.  After he stopped the Pontiac Grand Prix, Stavermann notified the Warren County communications center of the stop and the number of the Ohio license plate on that vehicle, grabbed his hat and a flashlight, exited his cruiser, and walked to the driver's side of Stephens' automobile.  The deputy then engaged in brief conversation with the Defendants, concerning the purpose of the traffic stop, and asked Stephens for his driver's license and proof of insurance.  Stavermann also asked Jones for identification and was given that Defendant's Social Security number and date of birth as a form of identification.  The deputy then returned to his cruiser and contacted Hayes.  About four minutes had elapsed when Stavermann began to contact Hayes.  Thereafter, he inputted Stephens' driver's licence number into his computer and was informed that there were no outstanding

_____

does not turn a reasonable detention into an unreasonable one).

warrants for that Defendant.[30]  Stavermann then entered Jones' Social Security number into his computer and was informed that there was an outstanding felony, burglary warrant for him.  That occurred slightly more than seven minutes after the deputy had activated the overhead lights on his cruiser.  Notably, Stavermann testified that it would take him about ten minutes to write a speeding ticket, even if he were to rush through the process.  Therefore, when Stavermann learned of the existence of the outstanding arrest warrant for Jones, the Defendants' detention had not yet been extended beyond what would have been necessary to write Stephens a speeding ticket.  See Caballes, 543 U.S. at 407.  Thereafter, Stavermann's primary focus was upon Jones and the outstanding felony warrant.[31]  Nothing in Fourth Amendment jurisprudence suggests that Stavermann violated the Fourth Amendment rights of either Defendant by focusing on Jones at that point, rather than on completing the traffic citation for Stephens.  On the contrary, that information concerning the outstanding warrant demonstrated that Stavermann had a reasonable and articulable suspicion that Jones had engaged in illegal activity, thus justifying his focusing on him.

After returning to the passenger side of the Pontiac Grand Prix, Stavermann asked Jones to step out of that vehicle and escorted him to the rear of that car, where the deputy asked him whether he possessed any weapons and frisked him.  Stavermann then placed Jones in handcuffs and walked him to the cruiser.  The

---

[30]It cannot be questioned that a police officer conducting a traffic stop is permitted, as part of the stop, to obtain personal identification of the driver and to run a check on him.  United States v. Hill, 195 F.3d 258 (6th Cir. 1999).

[31]While waiting in his cruiser for responses to his inquiries, Stavermann began to write the traffic citation, while observing the Defendants.  However, once he learned about the outstanding warrant, he focused upon Jones.

deputy placed Jones in the rear seat of that vehicle and explained to him that he had been taken into custody, because of the outstanding felony warrant in Franklin County, Ohio.  Jones was secured in the rear seat slightly more than twelve minutes after Stavermann had activated his overhead lights.  Approximately two minutes later, Zicco alerted on the driver's side of the Pontiac Grand Prix.[32]

During those two minutes, Stavermann took no steps to continue to write the traffic citation for Stephens.  In addition, he had, for the time being, completed his tasks with Jones.  Stavermann conferred with Hayes and, then, stood on the passenger's side of the Pontiac Grand Prix and watched Stephens while Hayes walked Zicco around that vehicle.  Above, the Court has concluded that Stavermann's observations from his initial contact with the Defendants did not establish reasonable suspicion, justifying the transformation of a traffic stop into a drug investigation.  The only additional fact learned by Stavermann thereafter, up to the point of the dog alert on the Pontiac, to be considered in the reasonable suspicion calculus, is the outstanding felony warrant for Jones.  The Government has failed to explain how that additional fact gives rise to reasonable suspicion to believe that the Defendants were involved in an offense involving drugs.  Therefore, Stavermann violated Stephens' rights under the Fourth Amendment by failing to return to writing the speeding ticket after securing Jones in custody.[33]  Nevertheless, the Court cannot, as a result, suppress the evidence that was seized

---

[32]Hayes and his dog had arrived at the location of the traffic stop about eleven minutes after Stavermann had activated the overhead lights on his cruiser.

[33]Of course, since Jones had previously been detained on the outstanding warrant, this discussion is not pertinent to the resolution of his request to suppress evidence.

when Stephens' automobile was searched.  If one subtracts the approximately five minutes, during which Stavermann focused his attention on Jones and the outstanding felony warrant, from the fourteen minutes that passed before the dog alerted, nine minutes remain, less than the minimum time it would have taken Stavermann to write a traffic ticket, even if he were to hurry.  See Caballes, 543 U.S. at 407.  Moreover, it is axiomatic that "but-for" causation is a necessary, although not sufficient, predicate for the suppression of evidence.  See e.g., United States v. Pearce, 531 F.3d 374, 381 (6th Cir. 2008).  In other words, this Court cannot suppress the evidence discovered during that search, unless it was discovered because of Stavermann's violation of the Fourth Amendment, in failing to return to writing a speeding citation for Stephens after taking Jones into custody.  In the absence of evidence that Stavermann could have finished that task in the two minutes between the time Jones was in custody and when Zicco alerted, this Court cannot find that the evidence in the Pontiac Grand Prix was discovered because of that violation of the Fourth Amendment by Stavermann.

Accordingly, the Court rejects the Defendants' assertions that the Court must suppress the evidence seized from Pontiac Grand Prix, because they were unlawfully detained before Zicco alerted on that automobile.[34]

---

[34]In his Reply Memorandum (Doc. #42), Stephens has cited United States v. Blair, 524 F.3d 740 (6th Cir. 2008), wherein the Sixth Circuit concluded that, under the facts and circumstances of that case, the detention of the defendant was not supported by reasonable suspicion and, thus, violated the Fourth Amendment. Given that the facts and circumstances giving rise to the request to suppress evidence in that prosecution are distinguishable from those giving rise to Stephens' and Jones' requests herein, that decision does not cause this Court to conclude that the evidence seized from the Pontiac Grand Prix must be suppressed.  It bears emphasis that a court's determination on whether the detention of a particular defendant was longer than necessary and, thus, violated the Fourth Amendment is

III.  Did the Alert by Zicco Establish Probable Cause to Search the Vehicle?

As is indicated, the Government contends that the alert by Zicco established probable cause to believe that controlled substances were located in the Pontiac Grand Prix, while Stephens takes the opposite position.  Before turning to that issue however, this Court will briefly discuss the Government's argument that searching that automobile did not violate the Fourth Amendment, regardless of whether the alert by the dog established probable cause to believe that controlled substances were located therein.  In particular, the Government argues that the search was lawful in accordance with New York v. Belton, 453 U.S. 454 (1981).  This Court does not agree.

In Belton, the Supreme Court held that officers are permitted to search the interior of a car, regardless of whether they have probable cause, when they arrest an occupant, as a search incident to a lawful arrest.  In Thornton v. United States, 541 U.S. 615 (2004), the Court extended Belton to instances where an individual, who has been a recent occupant of a vehicle, is arrested outside, thus authorizing officers to search the vehicle, as an incident to the arrest under those circumstances.  The area of the vehicle which officers may search in accordance with Belton and its progeny is somewhat limited.  The Belton Court stressed that its holding "encompasses only the interior of the passenger compartment of an automobile and does not encompass the trunk."  453 U.S. at 460 n. 4.  Recently, in United States v. Nichols, 512 F.3d 789 (6th Cir. 2008), the Sixth Circuit discussed the holding of Belton in that regard.  Therein, the defendant was arrested and the vehicle he had been driving was searched in accordance with

_____

a fact sensitive inquiry.

- 21 -

Belton.  He argued that the evidence seized from the locked glove compartment of his automobile had to be suppressed, because it was akin to a trunk.  While acknowledging that Belton does not authorize police to search the trunk of a car, it concluded that a locked glove compartment is not analogous to a trunk.  Id. at 797-98.  See also United States v. Jackson, 415 F.3d 88 (D.C. Cir. 2005) (holding that a firearm seized from the trunk of the defendant's vehicle after he had been arrested had to be suppressed, inter alia, because Belton does not authorize the search of an automobile's trunk).

Based upon the foregoing, it is clear that Belton did not justify the seizure of the cocaine, since that controlled substance was taken from a duffel bag which had been located in the trunk of Stephens' vehicle.  In contrast, however, the loaded pistol and the crack pipe were both taken from the passenger compartment of the Pontiac Grand Prix, an area of permissible search under Belton. Nevertheless, this Court cannot conclude that this evidence was lawfully seized in accordance with the doctrine established therein.  Belton was arrested before the automobile he had been riding was searched.  Herein, based on Stavermann's testimony, the Court is not able to conclude that Jones was arrested before the search of the Pontiac Grand Prix.  Stavermann testified that he could not arrest Jones until he obtained confirmation about the outstanding warrant for him, an event that did not occur before the search.  According to Stavermann, he had merely detained Jones.  Notably, the Government has not argued that Stavermann's testimony to the contrary notwithstanding, he had in fact arrested Jones when he detained him.

Accordingly, the Court rejects the Government's argument based upon Belton, and turns to the issue of whether the alert by Zicco established probable cause to believe that controlled substances were located in Stephens' Pontiac Grand Prix.

A positive reaction by a properly trained, reliable drug detection dog can establish probable cause for the presence of controlled substances. United States v. Berry, 90 F.3d 148, 153-54 (6th Cir.), cert. denied, 519 U.S. 999 (1996); United States v. Diaz, 25 F.3d 392, 394 (6th Cir. 1994). In Hill, the Sixth Circuit noted that "[i]t is well-established in this Circuit that an alert by a properly-trained and reliable dog establishes probable cause sufficient to justify a warrantless search of a stopped vehicle." 195 F.3d at 273. See also, United States v. Perez, 440 F.3d 363, 374 (6th Cir.) (noting that "[t]here is probable cause to justify a warrantless search of a vehicle once a properly trained and reliable drug detection dog alerts positively to the presence of drugs"), cert. denied, 127 S.Ct. 542 (2006). In United States v. Robinson, 390 F.3d 853 (6th Cir. 2004), the Sixth Circuit reiterated that "'after it is shown that the dog is certified, all other evidence relating to his accuracy goes only to the credibility of the testimony, not to the dog's qualifications.'" Id. at 874 (quoting United States v. Boxley, 373 F.3d 759, 762 (6th Cir. 2004)).

Herein, Stephens argues that the alert by Zicco did not establish such probable cause, because that canine was not a properly trained, reliable drug detection dog. The Government, not surprisingly, does not agree. Above, this Court has found, as a matter of fact, that, on March 9, 2007, the canine was a properly trained and reliable drug detection dog. Below, the Court sets forth its

reasoning in support of the finding of fact, beginning by reviewing the pertinent evidence.

Hayes, the handler of the drug detection dog, testified that he had first become involved with handling a drug detection dog in January, 2004. At Hayes' request, his trainer, Jeff Moody ("Moody") with Wachmeister Canine in Dublin, Ohio, located a dog for him, Zicco, in a kennel in Luxemburg. Moody then took possession of Zicco for about three months in order to pre-train him. During that period, Moody trained Zicco to alert to the odor of four types of controlled substances, to wit: heroin, cocaine, marijuana and methamphetamine, as well as their derivatives. In March, Hayes began training with Zicco in Dublin. That course of training lasted about six weeks. It consisted of Hayes learning how to read Zicco and to look for changes in his behavior. Hayes indicated that, during his training with Zicco, the canine was subjected to negative testing, which he explained took place when the substances hidden were not the type he had been trained to discover. Hayes also explained that Zicco was trained using extinction training, which was defined to him as teaching the dog to differentiate between target and non-target odors.[35] In some instances, Hayes was aware that the dog was searching for such an odor, and other times he was not. At the end of the training period, in June, 2004, Hayes and his dog, as a team, participated in and successfully passed the testing required for the certification process of the Ohio Peace Officer Training Commission ("OPOTC"). As a consequence, Hayes and

---

[35]When initially asked about extinction training, Hayes indicated that he was not familiar with the term.

Zicco were certified for narcotic detection and patrol.[36]  In particular, they were certified to detect the odors of marijuana, heroin, methamphetamine and cocaine, as well as their derivatives.  In addition, Hayes and Zicco have been certified by the North American Police Work Dog Association ("NAPWDA").[37]  Hayes and Zicco were recertified by that entity in July, 2005, and again during the summer of 2007.[38]

In accordance with policies adopted by the City of Mason, Hayes and Zicco were required to train four hours per month.  During most months, Hayes and Zicco have exceeded that requirement on drug detection alone, although during a few months they spent less than four hours on such training.[39]  Much of that training was informal, when Hayes would have down time at work.  He would set up a training course for Zicco, by hiding controlled substances in cars or the

_____

[36]Hayes and Zicco must be recertified every two years.  They were recertified in April, 2006, and, therefore, were validly certified when Stephens' Pontiac Grand Prix was stopped by Stavermann in March, 2007.

[37]In Ohio, certification by the OPOTC is mandatory, while that from the NAPWDA is voluntary.  The testing to obtain certification from the NAPWDA is much more difficult than that required for certification for the OPOTC.

[38]Zicco has been trained and certified as a dual-purpose dog, both for drug detection and for tracking, criminal apprehension searches and location.  Hayes did not elaborate on the meaning of the word "location," since he was not asked to do so by counsel.  Given the absence of a definition of what "location" means, it is not discussed herein.  Moreover, since Zicco was used to detect drugs during the events leading to this prosecution, the Court does not otherwise elaborate upon the canine's training in tracking, criminal apprehension searches and location.  Parenthetically, Hayes also used the phrase "article search" to describe criminal apprehension searches and location, and defined that phrase as trying to find an article in a woods or an open field with a fresh human odor on it.

[39]Given that Zicco is a dual-purpose dog, Hayes spent additional time training with him on tracking and the like.

interior of buildings.[40]  Hayes and Zicco also participated in formal training

conducted with canine handlers and their dogs from law enforcement agencies of

neighboring communities, such as the Dayton Police Department, the Wilmington

Police Department, the Ohio Department of Natural Resources and the Cincinnati

Police Department.[41]  There was no independent review of the performance of

Hayes and his dog during the formal and informal training that they underwent.

Although not required by departmental or state regulation, Hayes has maintained

records of the formal and informal training he has conducted with his canine.[42]  He

maintained the records in order to keep track of the odors on which he and the dog

had worked, so that they could concentrate training on areas where more training

was needed.  Hayes grades himself and Zicco on each training session as being

satisfactory or unsatisfactory.  When the training session is unsatisfactory, Hayes

spends additional time with his dog working on the area which caused the

problem.  During the period from June, 2004, when Zicco first became certified,

through March 9, 2007, when the dog alerted on the Pontiac Grand Prix, he and

his dog had nine unsatisfactory training sessions.  All nine of those training

sessions involved Zicco missing one type of drug, during a training session with

---

[40]Until early 2007, Hayes and Zicco were the only drug detection team employed
by the Mason Police Department.

[41]During those formal and informal training sessions, Zicco is trained with
distracting odors.  For instance, boards with hole in them are used in some training
sessions.  Items with distracting odors, such as leather, tobacco, firearms,
ammunition and cat and dog food, are placed in some of the holes.  Zicco has not
alerted on any of those distracting odors.

[42]Government Exhibit 10 is a copy of all training records, concerning drug detection
alone, from June, 2004, when Zicco became certified, until to March 9, 2007, the
date upon which Zicco alerted on Stephens' automobile.

multiple hides.  In each of those nine instances, the dog was satisfactory on all hides, but one.

Every time that Hayes has utilized Zicco in the field, he has compiled a canine incident report, which is a narrative summary of what occurred during the incident.  Hayes has compiled such reports since Zicco was initially certified in June, 2004.[43]  When his dog would alert on a car and no drugs were found, Hayes would ask the occupants whether they had been around drugs or whether controlled substances had recently been in the vehicle, in order to ascertain a reason for the false alert.  Only two of the canine incident reports reveal a false report by Zicco, where there was no explanation or justification for same.[44]

Based upon the foregoing evidence, the Court has found that, on March 9, 2007, Zicco was a properly trained and reliable drug detection dog.  Not unexpectedly, Stephens has presented a number of reasons why he does not believe that Zicco qualifies as such a dog.  In support of this attack on the reliability and proper training, Stephens relies upon the testimony by Steven Nicely

---

[43]Redacted copies of the canine incident reports, for the period from June, 2004, through March 9, 2007, are Government Exhibit 12.  That Exhibit includes reports for when Zicco was used both to detect drugs and to track, etc.

[44]As an example of an explanation for an alert by Zicco after which Hayes did not discover a type of controlled substances for which the dog had been trained, Hayes testified that he had the dog walk around a car at Kings Island, and the canine alerted near the passenger's side door.  Hayes discovered illegal substances therein, but not a derivative of the four types the dog had been trained to recognize.  However, Hayes was subsequently told by other officers that marijuana had been removed from the passenger's seat of the vehicle, prior to his arrival.

("Nicely"), a consultant he has retained.  This Court now turns the Stephens'

assertions in that regard and Nicely's testimony.[45]

Nicely testified that he is a professional dog trainer, who has been involved

in training or handling dogs for about 34 years.  In 1973, he enlisted in the Marine

Corps and joined a drug detection unit, in which he remained until 1979.  At some

point after leaving the Marine Corps, Nicely became a police officer, working in the

canine units of a number of police departments in Texas.  In 1993, he became a

trainer for Global Training Academy, and was its senior trainer from 1994-2006.

---

[45]In one of those assertions, Stephens argues that Zicco was so poorly trained and
unreliable, that the officers could not have believed in good faith that the dog's
alert established probable cause to search the Pontiac Grand Prix and that,
therefore, the good faith exception to the exclusionary rule, established in United
States v. Leon, 468 U.S. 897 (1984), is inapplicable.  See Doc. #37 at 14-15.
Parenthetically, this argument was undoubtedly spurred by the Government's
questioning of Nicely during cross-examination, about whether a reasonable officer
could have relied in good faith on the dog's certification.  It is not necessary to
address that argument, since the Government has failed to provide authority
establishing that the good faith exception to the exclusionary rule, established by
Leon, is applicable to the warrantless search of an automobile based on a positive
alert by a drug detection dog.  The Sixth Circuit explained, in United States v.
Leake, 998 F.2d 1359 (6th Cir. 1993), that Leon had modified the exclusionary rule
"so as not to bar the admission of evidence seized in reasonable, good-faith
reliance on a search warrant."  Id. at 1366 (emphasis added).  Moreover, courts
have routinely held that Leon does not apply to warrantless searches in analogous
situations.  See e.g., United States v. Cos, 498 F.3d 1115 (10th Cir. 2007)
(holding that Leon did not apply to officers' good faith but incorrect belief that
teenager had actual or apparent authority to consent to a warrantless search of
defendant's apartment); United States v. Herrera, 444 F.3d 1238 (10th Cir. 2006)
(declining to apply Leon to officers' good faith belief that truck being driven by
Defendant was a commercial vehicle and, thus, subject to an administrative search
at any time); United States v. Morgan, 743 F.2d 1158 (6th Cir. 1984) (holding that
Leon is inapplicable to warrantless search allegedly predicated on exigent
circumstances).  See also, United States v. Curzi, 867 F.2d 36 (1st Cir. 1989)
(noting that "this court has not recognized a good-faith exception in respect to
warrantless searches"); United States v. Winsor, 846 F.2d 1569, 1579 (9th Cir.
1988) (en banc) (noting that Leon applies only "to searches conducted in good
faith reliance on a warrant").

In 2005, he went to Iraq, where he was one of four individuals training the dogs used at the United States Embassy for bomb detection.  Nicely has trained hundreds of dogs for the Department of Defense and various law enforcement agencies.  The foregoing certainly demonstrates that Nicely is experienced in training detector dogs.[46]

Nicely testified that, in his opinion, Zicco was not a properly trained and reliable drug detection dog.  In his post-hearing memorandum, Stephens has pointed to the following criticisms by Nicely of that training and reliability, to support that opinion, to wit: 1) "dual-purpose training of this dog detrimentally affected its reliability as a drug-detecting canine;" 2) "that the [NAPWDA] is not an appropriate certifying body for drug-detector dogs;" 3) "the failure to use blind testing, double-blind testing [and] negative testing;" and 4) "the failure of Zicco and [Hayes] to be exposed to compounding variables as faulty training."  Doc. #37 at 14.  Based upon those criticisms, Stephens contends that this Court should follow Nicely's opinion on the subject and decline to find that Zicco is a properly trained and reliable drug detection dog.  As a means of analysis, the Court will initially set forth three basic reasons for declining to adopt Nicely's opinion concerning the training and reliability of Zicco, following which it will explain why those four criticisms do not cause this Court to alter its finding of fact that Hayes' canine was a properly trained and reliable drug detection dog, discussing the third and fourth criticisms together.

---

[46]The term "detector dog" is used to refer to a dog that has been trained to detect one or more items, such as types of controlled substances, cadavers and bombs.

Based upon Nicely's lengthy experience in using and training detector dogs, this Court has found that he is an experienced trainer of such dogs. However, Nicely conceded during cross-examination that he had based much of his testimony on behavioral science or psychology,[47] an area which this Court did not understand Nicely to be proffered as an expert. Moreover, even had he been, this Court would not find that Nicely is an expert in that field. He testified that his only formal training in behavioral science and psychology was taking five psychology courses at San Antonio Junior College, to wit: introduction to psychology, abnormal psychology, applied psychology, developmental psychology and behavioral modification. In addition, however, he has attended seminars during which that topic has been discussed and has discussed the topic with colleagues. There is, however, no indication that he has a degree in behavioral science or even psychology in general, nor has Nicely been trained in the discipline under the tutelage of a behavioral psychologist. Thus, this Court could not find that any opinion by Nicely concerning behavioral science was supported by sufficient education or training. Another shortcoming was Nicely's testimony that, not since 1993, had he been to a seminar, during which new developments in the field of training drug detection dogs had been discussed. That was, in large measure, because his focus had shifted to behavioral science. Thirdly, in determining whether a particular alert by Zicco was successful, Nicely relied upon what he referred to as probable cause (i.e., where the alert by the dog was part of the calculus of probable cause to search the vehicle), thus disregarding those searches where consent to search had been obtained prior to the alert. He cited no empirical

---

[47]Nicely defined behavioral science as a field of psychology.

studies which demonstrate that a dog handler's knowledge that consent to search a vehicle has been given will affect his (the handler's) behavior.  Nor did he indicate that, among dog handlers and trainers generally, successful searches after a dog has alerted will be disregarded, when accessing the dog's overall success, if consent was obtained before the dog alerted.  In a similar vein, Nicely considered alerts by the canine to be unsuccessful when no drugs were present, but an occupant of the vehicle indicated that drugs had recently been inside the vehicle or even consumed therein.  In other words, Nicely did not believe that a dog could detect residual odors.  He cited no studies in support of that proposition, nor did he indicate that it was generally accepted among dog trainers and handlers that an alert on an automobile in which the occupants had, for instance, recently smoked or transported marijuana was not a successful encounter by the dog.  All of the foregoing cause this Court to disregard Nicely's opinion concerning the improper training and lack of reliability of Hayes' canine.

Moreover, none of Nicely's criticisms, as identified by Stephens, considered separately and in combination, causes this Court to alter its finding of fact that Zicco is a properly trained and reliable drug detection dog.  First, Stephens argues Nicely was of the opinion that Zicco's training as a dual-purpose dog "detrimentally affected its reliability as a drug-detecting canine."  Stephens' argument in that regard is clearly supported by Nicely's testimony;[48] however, that testimony is not convincing.  In the report that he prepared for Stephens' counsel, setting forth his opinion concerning Zicco's shortcomings, Nicely did not mention the fact that the

---

[48]As is explained above, Zicco was trained both in locating controlled substances and in tracking, criminal apprehension searches and location.

canine had been trained for dual purposes.  In addition, the example Nicely used in his testimony to exhibit the potential horrors that dual-purpose training can cause, i.e., the potential catastrophic results of a handler misinterpreting his canine's alert to the trunk of a car, when the dog had been trained to detect bombs and drugs, is inapplicable herein, since Zicco was trained in locating controlled substances, and in tracking, criminal apprehension searches and location, rather than in detecting two types of substances such as controlled substances and bombs.  Also, Nicely did not point to studies and/or a general consensus among dog trainers and handlers, indicting that dual-purpose training renders a canine improperly trained or unreliable.

Second, Stephens argues that, according to Nicely, the NAPWDA is not an appropriate body to certify drug detection dogs.  Although Nicely so testified, this Court cannot agree that such testimony supports the premise.  As an initial matter, this Court notes the inconsistency between Nicely's testimony in that regard and his explanation of his qualifications, which included testimony that he had attended seminars given by the NAPWDA.  In addition, Nicely did not point to studies and/or a general consensus among dog trainers and handlers, indicting that the NAPWDA is not an appropriate body to certify drug detection canines.  On the contrary, he testified that everyone in the business is familiar with the acronym NAPWDA, meaning that those individuals would also be familiar with the North American Police Work Dog Association, the actual name of the entity.  It would seem inconceivable that an entire industry would be familiar with an entity which does not fulfill an essential function, to wit: properly certifying those dogs which can

reliably detect controlled substances.  Indeed, Nicely agreed that the NAPWDA is widely recognized as being reliable.

Third, Stephens argues that Nicely's testimony concerning the shortcomings in Zicco's training rendered him unreliable.  During the hearing, Nicely, inter alia, pointed to Hayes' failure to use blind testing, double-blind testing, negative testing and the failure of Zicco and Hayes to be exposed to compounding variables during training.[49]  Although that training was not perfect, this Court has found, a finding which is not altered herein, that the dog was properly trained.  That said, the most obvious shortcoming of the training program was that Hayes and Zicco were the only drug detection team in the Mason Police Department until early 2007. Therefore, Hayes had to conduct on duty training, during down times, on his own, making blind and double-blind testing impracticable.  The fairest interpretation of Hayes' testimony is that, when he and his dog participated in formal training with officers from other departments, they participated in blind, if not, double-blind training.[50]  Therefore, the Court cannot accept the premise that blind testing was not used in Zicco's training.  As to negative testing, Hayes and Nicely defined that term differently, explaining why Hayes could testify that negative training was utilized, while Nicely presented the opposite conclusion.  In the absence of

---

[49]Although Stephens has used the word "testing" as opposed to "training," as did Nicely frequently during his testimony, it is clear that the latter was referring to the type of exercises that a dog and its handler would participate in during a training session, rather than the type of test to which Zicco was subjected to during the certification process.  Nicely was not familiar with the requirements for the OPOTC, and he separately criticized the certification process of the NAPWDA without mentioning that this entity failed to use blind, double-blind and/or negative testing as part of the certification process.

[50]Hayes was not asked that question.

questioning of Hayes by Stephens' counsel on whether Hayes used the technique that Nicely defined as negative testing, i.e., "a test where absolutely nothing is placed" (III Tr. (Doc. #34) at 325), or a fuller explanation by Nicely as to why he concluded such testing was not used, this Court cannot find that this assertion renders the dog improperly trained or unreliable.  Additionally, Nicely did not point to studies and/or a general consensus among dog trainers and handlers, indicting that Hayes' failure to utilize these training techniques more than he did renders a canine improperly trained or unreliable.  For similar reasons, the Court rejects the point concerning the failure to be exposed to compounding odors during training.

In sum, given that Hayes and his dog have been repeatedly certified by the OPOTC and the NAPWDA, Nicely's testimony is pertinent only to the credibility of Zicco's alert and not to the canine's qualifications.  United States v. Boxley, 373 F.3d 759, 762 (6th Cir.), cert. denied, 543 U.S. 972 (2004).  That testimony has not caused this Court to discount the credibility of the alert or its finding of fact that Zicco was properly trained and reliable.  Accordingly, since an alert by a properly trained, reliable and certified dog is sufficient to establish probable cause to believe that controlled substances are located in an automobile, this Court concludes that the officers possessed such probable cause, once the alert was noted and before they entered Stephens' vehicle.


Having concluded that the detention of Stephens and Jones, before Zicco alerted on the Pontiac Grand Prix, did not violate their Fourth Amendment rights and the said alert established probable cause to believe that controlled substances

were located therein, the Court overrules Jones' and Stephens' Motions to

Suppress Evidence (Docs. ##20 and 21, respectively).


August 19, 2008

                                        /s/ Walter Herbert Rice
                                     _____
                                        WALTER HERBERT RICE, JUDGE
                                        UNITED STATES DISTRICT COURT


Copies to:

Counsel of Record.